**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LAWRENCE J. KEOHANE, JR., et al.,** | : | **CIVIL ACTION** |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **LANCASTER COUNTY, et al** | : | **NO. 07-3175** |
| **Defendants.** | : | |

**MEMORANDUM OPINION**

**GOLDBERG, J.**                                                                          **August 12, 2010**

       This civil rights action arises out of the tragic suicide death of Joseph P. Keohane, occurring

while he was held in pretrial detention at Lancaster County Prison ("LCP"). Plaintiffs, Lawrence

and Patricia Keohane, Joseph's parents and the administrators of his estate, have brought suit against

Defendants, Lancaster County and several prison employees for failing to prevent the suicide.[1]

These claims primarily allege constitutional violations under 42 U.S.C. § 1983.[2]

       Before the Court are Defendants' Motions for Summary Judgment. For the reasons set out

_____

       [1]Defendants include Lancaster County, Warden Vincent Guarini, Mental Health
Counselor Carrie McWilliams, Mental Health Counselor Bonnie Bair, Mental Health Counselor
Troy Waltz, Deputy Warden Robert Siemasko, Correctional Officer Edward Sutton and
Correctional Officer Brian Weaver, who we will refer to collectively as the "Lancaster County
Defendants." Medical Director Dr. Robert Doe is also a Defendant and has filed a separate
motion for summary judgment.

       [2]Specifically, Plaintiffs have asserted: Eighth and Fourteenth Amendment deliberate
indifference claims against the individual Defendants pursuant to 42 U.S.C. § 1983; Monell
claims against LCP and Warden Guarini and Deputy Warden Siemasko, in their official
capacities; violations of the Americans with Disabilities Act ("ADA"); and several state law
claims.

1

below, the Lancaster County Defendants' motion is granted in part and denied in part and Dr. Doe's motion is denied.

## I. BACKGROUND:

Unless indicated otherwise, the facts presented below are undisputed.[3]

A. Keohane's Arrest and Initial Hospitalization - November 20, 2006

Joseph Keohane was arrested on November 20, 2006, after his parents called the Pennsylvania State Police to report the theft of their safe. (L.C. Defs.' St. of Facts, ¶¶ 1, 4.) Plaintiffs testified that they called the police because their son had been struggling with serious drug addiction and mental health problems and they were very concerned about his well being due to numerous recent statements about ending his life. (Pls.' Brief in Opp., pp. 2-3.)

Keohane was arrested and, knowing that he had threatened suicide, the arresting officer brought him to Lancaster General Hospital ("LGH") for a pre-commitment evaluation. Keohane was evaluated, found not to be suicidal, and cleared for incarceration. The evaluating physician, Dr. Bret Levy, stated in his patient report that despite superficial scratches on one of his wrists, Keohane had freely admitted that he was not suicidal and had been attempting to manipulate his parents into allowing him to come home.

Although he was still under arrest, for reasons that are not entirely clear from the written submissions, Keohane was released and called his father. His father in turn called the police, who re-apprehended Keohane. He again threatened to commit suicide if he was incarcerated, and was

---

[3] Lancaster County Defendants' Statement of Undisputed Facts will be cited to as "L.C. Defs.' St. of Facts." Plaintiffs did not respond to Defendants' Statement of Undisputed Facts, nor did they submit their own statement of undisputed facts. We will therefore, look to their Amended Brief in Opposition to Defendant Lancaster County's Motion for Summary Judgment, cited to as "Pls.' Brief in Opp."

2

brought back to LGH for a second pre-commitment evaluation. Keohane was then discharged to a state trooper shortly after midnight on November 21, 2006, who brought him to Lancaster County Prison ("LCP") for commitment. (L.C. Defs.' St. of Facts, ¶¶ 6, 9-10, 12, 16.)

B. LCP's Suicide Status and Mental Health Operating Procedures

Prior to recounting what occurred after Keohane was brought to the LCP, we briefly summarize the facility's mental health procedures. LCP's "Suicide Status and Mental Health Operating Procedures" were implemented in March of 2001 and established a system of levels of suicide status and mental health status. Under this system, individuals are placed on various status levels based upon their behavior and review by the medical department/mental health department. The procedures require an inmate be placed on suicide status if the inmate:

> (1) makes "any overt attempt to inflict bodily harm;"
>
> (2) is severely depressed and "has given indication that he is planning to or is afraid of harming himself" . . .; and/or
>
> (4) is "at risk for suicide as a result of intake information, and or may be in crisis during incarceration period, but not admitting to suicidal ideation."

The procedures further state that, "the utilization of suicide status is a medical staff decision. In all cases the prison physician will make the decision regarding suicide status. However precautionary measures can be taken by medical staff . . . . [The] medical staff member on duty must notify medical director to obtain verbal order for the level of suicide status: This will be completed after a medical staff assessment of the inmate's clinical condition and mental status." Additionally, individuals on Suicide Status Level I (Serious Suicide Risk) and Level II (Potential for Suicide Risk) must be housed in camera cells, and "checked at a minimum and at random once every

3

15 minutes by correctional officer assigned to medical housing unit." Further, "suicide status will be reviewed every 24 hours or less by medical staff." (Suicide Status Standard Operating Procedure, pp. LCP 1020, 1022, 1024-27.)

Deputy Warden for Treatment Services, Robert Siemasko, who was involved in creating the procedures, testified that the procedures were the same during Keohane's incarceration in 2006 as when they were implemented in 2001. (Pls.' Brief in Opp., p. 5.) Dr. Robert Doe, the independent contractor who acted as the medical director at LCP, testified to the contrary. He stated that in 2004, after the suicide of another inmate, changes were made to the 2001 version of the procedures, and that under the revised procedures, decisions regarding the placement of an inmate on suicide status were made solely by psychiatric staff rather than by a doctor. (Doe's Memo., pp. 3-4; Pls.' Memo in Opp. Doe's Mot., p. 5.)[4]

C. LCP - November 21, 2006

Upon arrival at LCP, Keohane was initially interviewed by a LCP Mental Health/Mental Retardation (MH/MR) Counselor and completed the LCP Medical Department Questionnaire, indicating that he had tried to commit suicide by cutting his wrists the previous day. Consequently, Counselor Carrie McWilliams was called to perform a more comprehensive evaluation. Defendants note that McWilliams was a qualified mental health professional under the National Commission on Correctional Health Care ("NCCHC") standards, trained extensively in suicide prevention and

---

[4]Neither Defendant Doe nor Plaintiffs submitted a statement of undisputed facts. We, therefore, look to the "Memorandum of Law of Robert Doe, M.D. in Support of his Motion for Summary Judgment," cited to as "Doe's Memo." and "Plaintiffs' Amended Memorandum of Law in Opposition to Defendant Robert Doe's Motion for Summary Judgment," cited to as "Pls.' Memo in Opp to Doe's Mot."

intervention, and received her Suicide Prevention and Intervention Instructor certificate in June 2005.

According to Defendants, McWilliams placed Keohane on Suicide Status Level I as a precautionary measure because she was not sure whether he was genuinely suicidal. McWilliams noted Keohane's hospitalizations at LGH that night, and saw nothing indicating suicidal ideation on Keohane's discharge sheet from LGH. She noted that Keohane stated he was "currently suicidal and would not contract for safety."[5] McWilliams also noted that Keohane had positive eye contact, was angry, and that the cuts on his wrist appeared superficial. In accordance with his placement of suicide status, Keohane was transferred to a camera cell in the Medical Health Unit ("MHU"). (L.C. Defs.' St. of Facts, ¶¶ 12, 14-16, 19-20, 65.) Plaintiffs allege that McWilliams did not notify the Medical Director, Defendant Dr. Doe, that she had placed Keohane on suicide status. (Pls.' Brief in Opp., p. 4.)

D. LCP - November 22, 2006

The next day, November 22, 2006, Corrections Officer ("CO") Edward Sutton was on duty from 8 a.m. to 4 p.m. in the MHU where Keohane was held. Sutton's primary responsibility was to make pod checks. (Pls.' Brief in Opp., p. 7.)[6]

_____

[5]"Contract for safety" is "essentially an agreement to seek help before acting on a suicidal impulse." (Suicide: Causes and Clinical Management, Medscape, CME at http://cme.medscape.com/viewarticle/413195_3).

[6] Plaintiffs claim the Block Activity Report indicates that Sutton did not make the mandatory 15 minute checks on suicide cells on November 22, 2006. To support this fact, Plaintiffs refer to the Block Activity Report submitted as Exhibit 12. (Pls.' Brief in Opp., p. 7.) However, this report is dated "11/23/06," not November 22, 2010 as Plaintiffs contend, and it appears a Block Activity Report for November 22, 2006 was not submitted. Plaintiffs also point out that the block video reflects that Sutton made no cell checks between 1:11 p.m. and 4 p.m. However, this fact cannot be verified as the video submitted to the Court ends at 1:11 p.m. and does not resume until 4 p.m. (Pls.' Brief in Opp., Exhibit 13.)

McWilliams re-evaluated Keohane in the MHU at 1:06 p.m. while Sutton was on duty. McWilliams' progress notes of the re-evaluation state:

> Patient denies suicidal ideation and contracts for safety. Patient said he wanted to die but said he has no intention of doing anything to hurt himself. Patient stated he had been overly stressed but he does not feel suicidal. Patient denies past psych treatment or meds. Patient reported no other problems. Positive eye contact. Calm and appropriate.

(L.C. Defs.' St. of Facts, ¶ 22.)

McWilliams' assessment at that time was that Keohane suffered from situational depression but was negative for suicidal ideation. Thus, McWilliams decided to have Keohane removed from all mental health status and moved to general population. McWilliams testified that Keohane had exhibited "red flags" of suicidal ideation at his first evaluation in that he had told police he was suicidal, however, there were no "red flags" during her second evaluation. McWilliams completed a "Release from Suicide Status" form enumerating the reasons for the removal, including that Keohane was negative for suicidal ideation, had no plans to harm himself, was not hopeless or helpless, and had contracted for his safety, a claim which McWilliams felt was genuine. McWilliams explained to Keohane that he would be removed from suicide status and, in response to his question about whether he would be removed from the MHU, she told him that he "may move soon," but would not be leaving immediately.

After the re-evaluation, McWilliams wrote an email to prison supervisors that Keohane should be removed from all mental health status, and could be placed in the general population. (L.C. Defs.' St. of Facts, ¶ 23-24, 26, 28-30, 31-32, 36.) McWilliams also sent a separate email titled "Inmates to Watch For the Coming Up Four Day Weekend" to officers and staff. Keohane was

not on the list. (Pls.' Brief in Opp., pp. 5-6)

Plaintiffs stress that McWilliams' re-evaluation lasted less than four minutes. They also point out that there is no record of a conversation between McWilliams and the guards regarding Keohane's behavior, nor did McWilliams ever view surveillance video from that period.[7] Additionally, Plaintiffs claim that McWilliams did not notify the medical director of her decision to remove Keohane from suicide status as required by LCP policy. (Id.)

According to Plaintiffs, shortly after the re-evaluation Keohane called Sutton on the cell intercom and advised that he broke his finger by "rolling on it." Plaintiffs note that the surveillance video shows Keohane trying to injure himself, and Sutton's response was to indicate that Keohane harmed himself on purpose. (Pls.' Brief in Opp., p. 7; Cell Camera Video, Nov. 22, 2006, 1:23 p.m.) Sutton then brought Keohane to the medical unit at 1:26 p.m. where he was seen by nurse Cheree Hohenwarter. Keohane told her he had hurt his finger when he was "using [his] head to move up in [his] bed while [his] hands were in [his] jumpsuit" and his "hands slipped and [he] heard a pop." (L.C. Defs.' St. of Facts, ¶ 33.) Hohenwarter's notes indicate that Keohane hurt his finger by accident, and that after his finger was treated, Keohane asked: "So I'm not leaving here." The nurse responded: "I'm unsure where you'll be going at this point, I need to discuss it with the doctor, I don't know if he wants you to stay here (MHU) until your x-ray on Friday." (Pls.' Memo. in Opp. to Doe's Mot., pp. 6-7; Cell Camera Video, Nov. 22, 2006.)

Keohane was taken for another medical examination at some point during the evening of

---

[7] Plaintiffs claim the video footage of Keohane prior to the re-evaluation reflects Keohane was trying to break his finger. After careful viewing of the video in question, we conclude that it is not entirely clear what Keohane was doing during the period leading up to his re-evaluation. (Cell camera video, Nov. 22, 2006, 13:04-13:06.)

November 22, 2006 and presented to Dr. Doe, who authorized an x-ray for Keohane the next day, and pending evaluation of the x-ray, ordered bandaging of the finger and an ice pack. Doe had no conversation with Keohane about his suicide status, never saw his chart, nor was he asked to evaluate Keohane for mental health problems. Plaintiffs stress that Keohane was wearing the suicide status jumpsuit, that Dr. Doe had access to his charts and understood that there was no psychiatrist contracted with the prison. (Pls. Memo. in Opp. to Doe's Mot., p. 7, 19; Doe's Memo., pp. 1-2.)

E. LCP - November 23, 2006

CO Sutton came on shift in the MHU on the morning of November 23, 2006 and contacted Sgt. Ben Lefever about Keohane's status. Lefever reviewed McWilliams' email from the previous day instructing that Keohane be removed from mental health status, and instructed Sutton to carry out the removal. Keohane was not placed in general population but was moved from a camera cell to a regular cell in the MHU. (L.C. Defs.' St. of Facts, ¶¶ 37, 39.)

According to Defendants, Sutton performed 30 minute pod checks during his shift, which lasted from 8:00 a.m. to 4:00 p.m. Sutton noted three additional "normal interactions" with Keohane, including a request to call his parents which was granted. Keohane made three calls to his parents during which, according to Defendants, he gave no indication that he was depressed or suicidal, and talked of the future. Sutton's last pod check was at 3:43 p.m. (L.C. Defs.' St. of Facts, ¶¶ 40-46.) Plaintiffs claim the video recording shows no checks were made between 1:11 p.m. and 4 p.m., however, the video presented as part of this record ends at 1:11 p.m. (Pls.' Brief in Opp., pp. 8-9.)

CO Brian Weaver, who came on shift at MHU just before 4:00 p.m. on November 23, 2006, made pod checks at 3:57 p.m. and 4:33 p.m. Weaver testified that he always made sure he saw each inmate and that they were okay before moving on to the next cell. (L.C. Defs.' St. of Facts, ¶¶ 47-

50.)  The surveillance video shows Weaver walking by Keohane's cell at 4:04 p.m. and 4:37 p.m. According to Plaintiffs, Weaver walked by too quickly to see the entire cell.  (Pls.' Brief in Opp., pp. 8-9.)

Dinner service on November 23, 2006 began at 4:54 p.m.  Weaver entered Keohane's cell at 5:07 p.m. because his door was open but Keohane had not collected his dinner tray.  Weaver found Keohane hanging from the air event, with a sheet around his neck and tied through the holes of the air vent.  Weaver immediately called a Code Blue.  Keohane was cut down and individuals unsuccessfully attempted to resuscitate him.  (L.C. Defs.' St. of Facts, ¶¶ 51-52, 55-63.)

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  In order to defeat a motion for summary judgment, disputes must be both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law, and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A party moving for summary judgment has the initial burden of supporting its motion with evidence that would be admissible in a trial.  Anderson, 477 U.S. at 248.  If this requirement is satisfied, the burden shifts to the nonmoving party to "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).  The nonmoving party may meet this burden either by submitting evidence that negates an essential element of the moving party's claims, or by demonstrating that

the movant's factual evidence is insufficient to establish an essential element of its claims.  Celotex, 477 U.S. at 331.

The nonmoving party cannot avert summary judgment with speculation or conclusory allegations, such as those found in the pleadings, but rather, must present evidence from which a jury could reasonably find in its favor.  Ridgewood Bd. of Edu. v. N.E. for M.E., 172 F.3d 238, 252 (3d Cir. 1999).  Finally, in reviewing a motion for summary judgment, the court "does not make credibility determinations and must view facts and inferences in the light most favorable to the party opposing the motion."  Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1127 (3d Cir. 1995).

## III. DISCUSSION

### A.  Legal Standards - Eighth and Fourteenth Amendment Claims

Plaintiffs have brought claims pursuant to 42 U.S.C. § 1983 for unconstitutional deprivation of medical care in the prison suicide of a pre-trial detainee under the Eighth and Fourteenth Amendments against Warden Guarini, Deputy Warden Siemasko, Counselor McWilliams, Correctional Officers Bair, Waltz, Sutton and Weaver, and Medical Director Doe.

A pre-trial detainee's constitutional claims brought under § 1983 are analyzed under the Fourteenth Amendment.[8]  The Third Circuit has established a standard to examine liability for § 1983 cases involving the suicide of a pre-trial detainee.  In order to establish liability, a plaintiff  must

---

[8] Prisoner claims of inadequate medical care are analyzed under the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).  Since it is undisputed that Keohane was a pre-trial detainee, and not a prisoner, we will dismiss Plaintiffs' Eighth Amendment claim.  Wood v. City of Lancaster, 2009 WL 80306 at *15 (E.D.Pa. Jan. 13, 2009) (citing City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983)).

show: (1) the detainee had a "particular vulnerability to suicide;" (2) the custodial officers knew or should have known of that vulnerability; and (3) those officers "acted with reckless indifference" to the detainee's particular vulnerability. Woloszyn v. County of Lawrence, 369 F.3d 314, 319 (3d Cir. 2005) (quoting Colburn v. Upper Darby Twp., 946 F.2d 1017, 1023 (3d Cir. 1991) ("Colburn II")). In short, "'when the factual scenario presented by a plaintiff suggests that [the defendant] should have known that the prisoner was a suicide risk, and failed to take necessary and available precautions to protect the prisoner from self-inflicted wounds' the claim will survive." Francis v. Northumberland County, 636 F.Supp.2d 368, 385 (E.D.Pa. 2009) (citing Freedman v. City of Allentown, 853 F.2d 1111, 1115 (3d Cir. 1988)).

The first requirement, that the detainee have a "particular vulnerability to suicide," assesses the degree of risk inherent in the detainee's condition. Colburn II, 946 F.2d at 1024. A plaintiff must present evidence that there was a "strong likelihood rather than a mere possibility, that self-inflicted harm would occur." Id. "The detainee's condition must be such that a failure to treat can be expected to lead to substantial and unnecessary suffering, injury or death. Moreover, the condition must be 'one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for doctor's attention.'" Woloszyn, 369 F.3d at 320 (citing Colburn II, 946 F.2d at 1023).

The second prong requires that plaintiffs show that the custodial officials "'knew or should have known' of that strong likelihood" of suicide. Colburn II, 946 F.2d at 1024. That a defendant "knew" can be demonstrated when the "officials have had actual knowledge of an obvious suicide threat, a history of suicide attempts, or a psychiatric diagnosis identifying suicidal propensities." Colburn II, 946 F.2d at 1025 n.1. "Should have known" means "something more than a negligent

11

failure to appreciate the risk of suicide . . . though something less than subjective appreciation." Colburn II, 946 F.2d at 1025.

The third prong, requiring that the plaintiff show that the defendant acted with "reckless indifference," is "a necessary link between the prison official's knowledge and his disregard of the prisoner's particular risk." Schueneman v. United States, 2006 WL 408404, *2 (3d Cir. Feb 23, 2006). While the Third Circuit has not defined the exact contours of the third prong, the Fourteenth Amendment affords pre-trial detainees at least the protections that the Eighth Amendment affords to convicted prisoners. Wood, 2009 WL 80306 at *15 (citing City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244 (1983). Under the Eighth Amendment, deliberate indifference to a serious medical need is a subjective standard, requiring the plaintiff to prove that the defendant "knows of and disregards an excessive risk to inmate health and safety." Woloszyn, 396 F.3d at 325 (citing Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The standard for a pretrial detainee, therefore, requires less than the standard articulated in Farmer, but still requires "a level of culpability higher than a negligent failure to protect from self-inflicted harm." Colburn II, 946 F.2d at 1024. The standard is "similar to recklessness - Plaintiff must illustrate that the Individual Prison Defendants knew or should have known of [the detainee's] serious medical need and that they acted in conscious disregard of that need." Morgan-Mapp v. George W. Hill Correctional Facility, 2008 WL 4211699 (E.D.Pa. Sept. 12, 2008) (citing Colburn II, 946 F.2d at 1024-25; Woloszyn, 396 F.3d at 321; Weyant v. Okst, 101 F.3d 845, 856-57 (2d Cir. 1996)).

Finally, "[t]o impose liability under Section 1983, a plaintiff must establish with particularity that the named defendant was directly and personally involved in the deprivation of plaintiff's rights." Payton v. Vaugh, 798 F.Supp. 258, 260 (E.D. Pa. 1992) (citing Rode v. Dellarciprete, 845 F.2d 1195,

1207 (3d Cir. 1988); <u>Hampton v. Holmesburg Prison Officials</u>, 546 F.2d 1077, 1082 (3d Cir. 1976).

The plaintiff must show actual participation, or actual knowledge and acquiescence in the unlawful

conduct.  <u>Id</u>. (citing <u>Roach v. Kligman</u>, 412 F.Supp. 521, 528 (E.D.Pa 1976)).  The doctrine of

*respondeat superior* is inapplicable in § 1983 claims.  <u>Id</u>.

With this precedential framework in mind, we turn to Defendants' arguments and the facts

of record, examining them in the light most favorable to Plaintiffs.

### B.  <u>Analysis - § 1983 Claims</u>

Defendants first assert that Keohane was not "particularly vulnerable" to suicide.

Specifically, they point out that Keohane was evaluated twice prior to his incarceration by Dr. Levy

of LGH, who determined that Keohane did not require treatment.  Defendants note that Levy stated:

"I believe this is very clearly manipulative behavior because [Keohane] does not want to be

incarcerated.  I do not feel that he is depressed or suicidal."  Defendants also stress that Keohane

denied suicidal ideation once in prison during his re-evaluation with McWilliams, stating that he had

no intention of doing anything to harm himself.  Lastly, Defendants note that Keohane spoke with his

parents hours before his suicide, and they were not concerned about his safety.  (Defs.' Brief, pp. 10-

11.)

Plaintiffs respond that an issue of fact remains as to whether it was "obvious" that Keohane

was particularly vulnerable to suicide based on the undisputed facts that he had made suicidal

statements and because he was initially placed on Suicide Status Level I by McWilliams *after* his

hospital evaluation.  (Pls.' Amend. Brief, pp. 12-13.)

The facts at issue include varying statements made by Keohane regarding suicide and an initial

judgment by a LCP Counselor that he be placed on Suicide Status Level I. Viewing these facts in a light favorable to Plaintiff, we conclude that a jury should decide whether there was a strong likelihood that "self-inflicted harm would occur."

As set forth above, under the second and third prongs, Plaintiff must also point to evidence establishing that each Defendant knew or should have known of Keohane's particular vulnerability and acted with reckless indifference to the vulnerability. We first analyze these standards regarding the four named Defendants who had no personal contact with Keohane and were not involved in his treatment: Troy Waltz, Bonnie Bair, Warden Vincent Guarini, and Deputy Warden Robert Siemasko.

### 1. Defendants Waltz, Bair, Guarini and Siemasko

Defendants stress that Mental Health Counselors' Troy Waltz and Bonnie Bair, Warden Vincent Guarini, and Deputy Warden Robert Siemasko had no personal contact with Keohane and were not involved in his treatment, and thus, Plaintiffs cannot establish that these Defendants "knew or should have known" about Keohane's vulnerability and could not have acted with "reckless indifference." (Defs.' Brief, pp. 15-16.) As noted above, "[t]o impose liability under § 1983, a plaintiff must establish with particularity that the named defendant was directly and personally involved in the deprivation of plaintiff's rights." Payton, 798 F. Supp. at 260.

The record supports Defendants' position that claims against Waltz and Bair should be dismissed. Defendant Waltz was a mental health counselor of the County of Lancaster and LCP, however, he was not working at any time during the present action and had no contact with Keohane. Defendant Bair was also a mental health counselor for the County of Lancaster and LCP but also had no involvement with Keohane. (L.C. Defs.' St. of Facts, ¶ 67; First Amend. Compl., ¶¶ 18-19.)

Plaintiffs have provided no evidence to the contrary, therefore, all claims against Waltz and Bair are dismissed.

Additionally, Plaintiffs have not provided any evidence that Warden Guarini or Deputy Warden Siemasko had any contact with Keohane or that they knew or should have known that Keohane had a particular vulnerability to suicide. Indeed, in their response to Defendants' motion, Plaintiffs do not mention Guarini or Siemasko, by name or title, as having known anything about Keohane's situation. (Pls.' Amended Brief, pp.13-15.) Further, nothing in the LCP policies requires that the mental health counselor or medical director notify the warden of an inmate's placement on suicide status. (Suicide Status & Mental Health Operating Procedures, 2001.) In order to make a § 1983 claim, the named defendant must be "directly and personally involved in the deprivation of plaintiff's rights." Liability against Guarini and Siemasko cannot be established through the doctrine of *respondeat superior*, <u>Payton</u>, 798 F.Supp. at 260. Thus, the § 1983 claims against Guarini and Siemasko will also be dismissed.

## 2. <u>Defendants McWilliams, Sutton, Weaver and Doe</u>

### a. <u>Carrie McWilliams</u>

Defendants also assert that there is insufficient evidence for a jury to conclude that McWilliams "knew or should have known" that there was a strong likelihood of suicide. Plaintiffs respond that McWilliams "knew" of the strong likelihood that Keohane would commit suicide because: this information was included in his intake questionnaire; Keohane told McWilliams that he was currently suicidal; and because Keohane was placed on suicide status. (Pls.' Amended Memo., pp.13-14.)

According to the Third Circuit, an official "knew" of a vulnerability if they "have had actual knowledge of an obvious suicide threat, a history of suicide attempts, or a psychiatric diagnosis identifying suicidal propensities." Colburn II, 946 F.2d at 1025 n.1. Given these standards, we find a jury could determine that McWilliams knew Keohane was particularly vulnerable to suicide as she evaluated Keohane on November 21, 2006, had actual knowledge of his history of suicide attempts and understood that he was "currently suicidal."

We also conclude that there are genuine issues of material fact as to whether McWilliams was recklessly indifferent to Keohane's serious medical needs. While Plaintiffs acknowledge that McWilliams acted properly in initially placing Keohane on Suicide Status I, they assert that a jury could find that McWilliams acted with reckless indifference because she: (1) removed Keohane from suicide status after only a four minute re-evaluation; (2) had no understanding of Keohane's behavior during the time between her original evaluation and her re-evaluation; and (3) failed to ask CO Sutton if anything unusual had happened or watch the video of his cell from the preceeding 24 hours. According to Plaintiffs, if McWilliams had spoken with Sutton, she would have known about Keohane attempting to break his finger - a suicidal warning sign. Plaintiffs also stress that McWilliams failed to notify the medical director of her decision to remove Keohane from suicide status in violation of LPC's mental health procedures. (Pls.' Br. in Opp., pp.15-16.)

We agree with Plaintiffs that, if accepted, these facts could lead a jury to conclude that McWilliams acted with reckless indifference by removing Keohane from suicide status. A four minute re-evaluation of a person who had previously threatened suicide, coupled with the possibility that Keohane was trying to break his own finger, and McWilliams' alleged failure to abide by prison policy in failing to notify Dr. Doe of changes to Keohane's mental health status, should all be

considered by a jury. Thus, Plaintiffs' § 1983 claim against McWilliams survives summary judgment.

### b. CO Sutton

Plaintiffs have also presented sufficient evidence to establish that Sutton knew Keohane was particularly vulnerable to suicide as Sutton stated in his deposition testimony that he was aware that Keohane was on suicide status as of November 22, 2006. (Pls.' Br. in Opp., p.14.)

There are also material questions of fact as to whether Sutton acted with reckless indifference. Plaintiffs correctly note that a jury could conclude that Keohane attempted to break his finger while Sutton was on duty in the MHU, yet Sutton did nothing to stop him. When Keohane called Sutton at the MHU desk via his intercom telling him that he had injured his finger, according to Plaintiffs, Sutton responded to Keohane that he had done it on purpose. While Sutton brought Keohane to see medical staff, he failed to report the details of the incident to anyone, despite the LCP procedures reflecting that self inflicted harm could be a sign of suicidal ideation.[9] (Pls. Memo., pp. 16-17.) Sutton claims that he does not remember the incident, but whether it occurred is, of course, a factual dispute. (Sutton Dep., pp. 27-29.) Plaintiffs' § 1983 claim against Sutton, therefore, survives summary judgment.

### c. CO Weaver

We also find that a jury could conclude that Weaver, who worked the 4 p.m. to 12 a.m. shift in the MHU, was aware that Keohane was particularly vulnerable to suicide as he stated in his deposition that he knew Keohane was on suicide status on November 22, 2006.

_____

[9] These procedures state, "Criteria - How resident (inmate) goes on suicide status. 1. Any overt attempt to inflict bodily harm." (Suicide Status Procedures, p. LCP 1022.)

Plaintiffs also argue that a jury could find that Weaver acted with reckless indifference because, despite knowing that Keohane had been on suicide status, he did not, as required by prison policy, conduct a thorough check of Keohane's cell. Plaintiffs assert that the video of this cell check depicts Weaver walking by Keohane's cell at a fast pace, barely turning his head to the side as he passed the door so that he could not have observed the entire cell. (Pls. Memo., pp. 8-9; Block Video, Nov. 23, 2006, 3:55 p.m. to 5:15 p.m.)

Defendants respond that Weaver acted appropriately in accordance with LCP policies, conducting a pod check every 30 minutes and looking in each cell, as required by the policy. They also point to Weaver's testimony that he always makes sure that he sees each inmate during these checks, and they stress that deliberate indifference requires a sufficiently culpable state of mind, here, reckless indifference to a substantial risk.

Having carefully reviewed the video in question, we find that a jury could certainly conclude that Weaver passed Keohane's cell in a hurried, fast-paced fashion, never observing Keohane. This evidence, when viewed in conjunction with Weaver's knowledge that Keohane had been on Suicide Status I the day before, could establish his reckless indifference.

### d. Dr. Doe

According to Doe, his primary duties as LCP medical director were to address medical problems of inmates, be available for questions of medical staff, and be on call to respond to emergencies. He claims that he had supervisory authority over nursing staff but did not hire or fire nursing staff or mental health counselors. He further asserts that he had no supervisory responsibility or authority to direct the care they provided. (Doe's Memo., pp. 1-2.)

Based on these facts, Doe urges that summary judgment should be granted on his behalf because he had no personal knowledge of Keohane's mental status and therefore, cannot be held liable for his treatment. He stresses that it was not required that he be made aware of Keohane's status because the 2001 suicide procedures, requiring the medical director to sign off on any placement on suicide status or change of status, were revised in 2004. Regarding when he saw Keohane on November 22, 2006, Doe claims he merely authorized an x-ray, and pending evaluation of the x-ray, ordered bandaging of the finger and an ice pack. Doe notes that he had no conversation with Keohane about his suicide status or any other matter, that he never saw Keohane's medical chart and was never asked to evaluate Keohane for mental health problems. (Id. at., pp. 1-8.)

Plaintiffs respond that Siemasko, McWilliams and Weaver all testified that the 2001 version of the LCP suicide status procedures was in effect on the date of Keohane's death. Under these procedures, the mental health counselor is required to notify the medical director, here Dr. Doe, to obtain a "verbal order for the level of suicide status." Therefore, Plaintiffs' claim that Dr. Doe was responsible for overseeing the work of the mental health counselors and should have known of inmates on suicide status. Plaintiffs further point out that Keohane presented to Doe with a broken finger, and thus, Doe had Keohane's medical chart, which had clear documentation of his status, and Keohane was wearing a jumpsuit worn primarily by inmates on suicide status. (Pls.' Opp. to Doe's Memo., pp. 10-13.) Given these facts, Plaintiffs claim that there are genuine issues of material fact as to whether Dr. Doe should have known that Keohane was a suicide risk.

Given the differing versions of which suicide policy was in place, and thus, whether Doe should have been notified of Keohane's status under the policy, and circumstantial evidence, which if accepted, could establish that Doe was aware of Keohane's suicide status, there are genuine issues

of material fact as to whether Dr. Doe knew or should have known that Keohane was on suicide status.

Doe next claims that, even if he was aware of Keohane's status, his actions do not rise to the level of reckless or deliberate indifference. The law regarding medical treatment is well-settled. In order to find a constitutional violation arising from improper medical treatment, a prisoner must allege acts or omissions sufficiently harmful to evidence a "deliberate indifference to a serious medical need." Estelle v. Gamble, 429 U.S. 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Negligent treatment does not rise to the level of a constitutional violation. Id. at 106. Therefore, where a prisoner has received some medical attention, and there is a dispute over the adequacy of the treatment received, federal courts are reluctant to second guess medical opinions unless the medical attention was so woefully inadequate as to amount to no treatment at all. Sturts v. City of Philadelphia, 529 F.Supp 434, 438 (E.D.Pa 1982) (citing Pinon v. Wisconsin, 368 F.Supp. 608, 610 (E.D.Wis. 1973)). Based on this precedent, Doe argues that the only issue is the adequacy of his treatment of Keohane's finger, and urges that there is no dispute that this treatment was sufficient. He further stresses that his treatment did not cause Keohane's death. (Doe's Memo., p. 5.)

Plaintiffs respond that there are genuine issues of material fact as to whether Doe acted with reckless indifference to Keohane's medical needs because he failed to address Keohane's mental health issues. Noting that Doe should have been aware of Keohane's suicide status, Plaintiffs emphasize that the LCP policy states that it is the "medical director who designates inmate's level of suicide risk," and that Doe deliberately disregarded these procedures. Plaintiffs urge that a jury could conclude that had Dr. Doe taken time to evaluate Keohane, he may have remained on suicide status. (Pls.' Opp. to Doe's Memo., pp. 20-24.)

Viewing this evidence in a light most favorable to Plaintiffs, we conclude that Plaintiffs have presented sufficient evidence, which if believed, could demonstrate that Dr. Doe was recklessly indifferent to Keohane's needs. Thus, the claim against Dr. Doe survives summary judgment.

## C. **Qualified Immunity of McWilliams, Sutton, and Weaver**

Defendants next argue that even if the Court were to find that McWilliams, Sutton, and Weaver violated Keohane's constitutional rights, they are entitled to qualified immunity.[10] The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 129 S.Ct. 808, 172 L.Ed.2d 565, 815 (2009).

The Supreme Court has established a two-step inquiry for analyzing claims of qualified immunity. First the court must determine whether, considering the facts alleged in a light most favorable to plaintiff, there has been a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). If so, the second question is whether the constitutional right is clearly established. Id. A right is "clearly established" when the contours of the right are "sufficiently clear that a reasonable officer would understand that what he is doing violates that right." Id. (citing Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Qualified immunity gives government officials "ample room for mistaken judgements" by protecting "all but the plainly incompetent or those who knowingly violate the law." Hunter v. Bryant, 502 U.S. 224, 229 (1991). Granting

---

[10] Plaintiffs also set forth arguments as to why Guarini and Siemasko should not be granted qualified immunity. Because the individual § 1983 claims against them will be dismissed, a qualified immunity analysis is not necessary.

qualified immunity is premature if facts material to the immunity analysis remain at issue. <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 242 n.7 (3d Cir. 2008) (citing <u>Curley v. Klem</u>, 298 F.3d 271, 278 (3d Cir. 2002)).

Defendants argue that even if Keohane's rights were violated, McWilliams, Sutton, and Weaver are entitled to qualified immunity because they acted in good faith in monitoring Keohane and in providing him medical and mental health care. Specifically, Defendants assert that McWilliams followed LCP policy in completing an intake interview with Keohane, placing him on suicide status as a precaution, and in interviewing Keohane again within 24 hours and determining that he could be safely removed from suicide status. Defendants also point out that Sutton and Weaver monitored Keohane in conformance with LCP procedures, and because their actions were reasonable, qualified immunity applies. (Defs.' Memo., p. 17-18.)

We have previously found that when viewing the facts in a light most favorable to Plaintiffs, genuine issues of material fact exist as to whether Defendants McWilliams, Sutton, and Weaver violated Keohane's Fourteenth Amendment right by acting with reckless indifference to his serious medical need. As it relates to a qualified immunity analysis, we also conclude that a jury could determine that a reasonable mental health counselor in McWilliams' position would know that there would be constitutional implications for removing a detainee from suicide status who claimed to have attempted suicide two days prior, after a four minute evaluation without asking about his behavior during the previous 24 hours and without notifying the medical director. We also agree that a jury could conclude that a reasonable officer in Sutton's position would have known that there would be constitutional implications for failing to take reasonable steps to report the self-inflicted injury of a detainee just removed from suicide status. A jury could also find the suicide could have been

prevented had Sutton reported Keohane's self-inflicted harm as Keohane may not have been removed from suicide status.

Lastly, we agree with Plaintiffs that there are factual disputes as to whether a reasonable officer in Weaver's position would have known that there would be constitutional implications for failing to adequately check the status of an inmate who he was aware was on suicide status the previous day.   Because it is  "inappropriate to grant summary judgment if there are material factual disputes as to whether a constitutional violation has occurred or whether the constitutional right is clearly established," we decline, at this juncture, to afford McWilliams, Sutton and Weaver with qualified immunity protection.  Boria, 2009 WL 902421, at *8 (citing Curley v. Klem, 499 F.3d 199 (3d Cir. 2007)).

**D. Monell Claims**

Defendants next argue that Plaintiffs' derivative § 1983 Monell claim against Lancaster County, Warden Guarini, and Deputy Warden Siemasko must also be dismissed.  For the following reasons, we agree.

1.  Applicable Law

Municipal entities will only be found liable under § 1983 when government custom or policy was the proximate cause of a constitutional violation.  Monell v. New York City Dep't of Social Services, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).  A municipality cannot be held liable under a theory of respondeat superior.  Monell, 436 U.S. at 693-94.  Rather, "a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom."  Bielevicz v. Dubinon, 915 F.2d

845, 850 (3d Cir. 1990). Additionally, the practice must be so widespread that the policy making officials have either actual or constructive notice. Berg v. Allegheny, 219 F.3d 261, 276 (3d Cir. 2000) (citing Silva v. Worden, 130 F.3d 26, 31 (1st Cir. 1997)).

A municipal policy exists "'when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy or edict." Id. (citing Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990)). A municipal custom is identified by showing that a "given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as to virtually constitute law." Id.

Once a plaintiff has identified a policy or custom, he "must show that the municipal action was taken with the requisite degree of culpability, and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." Vulcan Pioneers of New Jersey v. City of Newark, 2010 WL 1226345 (3d Cir. Mar. 31, 2010) (citing Bd. of the County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)). If the policy does not facially violate federal law, "causation can be established only by 'demonstrat[ing] that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences.'" Berg, 219 F.3d at 276 (citing Bd. of the County Comm'rs of Bryan County, 520 U.S. at 404).

Municipal liability can also be predicated upon a failure to train, but only where the "failure amounts to 'deliberate indifference to the [constitutional] rights of persons with whom the police come in contact.'" Woloszyn v. County of Lawrence, 396 F.3d 314, 324 (3d Cir. 2004) (quoting Colburn II, 946 F.2d at 1028) (citing City of Canton, 489 U.S. at 388). To establish municipal liability for failure to train in a prison suicide case, the plaintiff must (1) identify specific training not

provided that reasonably could be expected to prevent the suicide that occurred, and (2) demonstrate that the "risk reduction associated with training is so great that failure of those responsible for the content of the training program to provide it can reasonably be attributed to a deliberate indifference to whether the detainees succeed in taking their lives." Woloszyn, 396 F.3d at 325 (citing Colburn II, 946 F.2d at 1029-30). A failure to train, discipline, or control can only form the basis of municipal liability where a plaintiff can show "contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents and circumstances under which the supervisor's action or inaction could be found to have communicated a message of approval to the offending subordinate." Diamond v. City of Philadelphia, 2007 WL 4242048 at * 5 (E.D.Pa. Nov. 28, 2007) (citing Montgomery v. De Simone, 159 F.3d 120, 127 (3d Cir. 1998)).

### 2. Policy or Custom

Here, the amended complaint alleges that Municipal Defendants Warden Guarini, Deputy Warden Siemasko and Lancaster County failed to promulgate and enforce a policy relating to the treatment of serious medical needs of inmates. (Pls.' Amend. Compl., ¶¶ 44-55.)

In their motion, Defendants do not directly address Plaintiffs' allegations that the Municipal Defendants failed to enforce LCP policy. Plaintiffs, nevertheless, respond to Defendants' motion by contending that it was custom and practice for the LCP suicide status and mental health operating procedures to go unenforced, and that such failures led to violations of the procedures which were the moving force behind Keohane's constitutional deprivations and subsequent suicide. According to Plaintiffs, the LCP operating procedures required that the decision about suicide status be made by a physician and that a counselor, such as McWilliams, obtain a verbal order or signature from a physician or medical director in order to remove an inmate from suicide status. Based on the

deposition testimony of Doe and McWilliams, Plaintiffs claim these procedures were never followed and point to the particular circumstances of this case wherein McWilliams did not receive approval from Doe to remove Keohane from suicide status. (Pls. Memo., pp 20-21.)

We find that Plaintiffs may have pointed to sufficient evidence that several members of the LCP staff did not know of, or failed to follow, the alleged established procedures regarding removal from suicide status. We also find that while the violations of procedures do not constitute "policy," there remains a question as to whether such practices were followed consistently enough to be deemed "custom." However, even if these practices constituted "custom," Plaintiffs must also establish that the practice was so widespread that the policy making officials had either actual or constructive notice, and acquiesced in the custom. Berg, 219 F.3d at 276. Plaintiffs cite to Guarini and Seimasko as having such power,[11] yet, even assuming that they were the policy making officials, Plaintiffs have not presented evidence that they had knowledge of McWilliams' and Doe's alleged breaches of the suicide status operating procedures either in the case of Keohane or at any point prior to November 2006.[12] Nor have Plaintiffs presented evidence that LCP's policy making officials had constructive notice of the alleged breaches. Indeed, Plaintiffs have not cited to any evidence regarding how many prisoners were improperly placed on, or taken off of, suicide status in any given period of time. In short, there is no record of the frequency of the alleged breaches. Plaintiffs have therefore, not

---

[11] In their opposition to Defendants' motion for summary judgment, Plaintiffs cite to Seimasko as having been involved in the creation of the Suicide Status and Mental Health Status Standard Operating Procedures and Guarini as responsible for the development and approval of policies. (Pls.' Memo. in Opp., pp. 20-21.)

[12] Plaintiffs note that there was a suicide at LCP in 2004. However, there is no information of record regarding the circumstances of that occurrence or whether placement on suicide status was at issue.

sufficiently shown that policymakers had actual or constructive knowledge, and acquiesced in, McWilliams' or Dr. Doe's alleged violations of procedure.

Plaintiffs also claim that LCP "had an official policy, practice or custom of . . . failing to hire prison personnel who were professionally qualified and competent to care for the medical needs of incarcerated persons, especially those with a particular vulnerability to suicide." This claim is based on the allegation that McWilliams was not a nationally accredited mental health counselor. Plaintiffs also point to the testimony of Doe, indicating that he was not sure what the counselor's qualifications were, but that his general understanding was that the counselors had "bachelor's degrees and [] specific training for suicide prevention, suicide assessments, and managing mental health patients . . . but that they were not licensed, per se." (Pls.' Memo. in Opp. to Doe's Memo., p. 6; Doe Dep., p. 27.)

Even assuming Plaintiffs could establish that there was a custom of hiring mental health counselors who were not nationally accredited, and the policymakers knew of the custom, Plaintiffs have not established that there was a "direct causal link" between LCP's alleged failure to hire nationally accredited counselors and the deprivation of Keohane's federal rights. Board of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 404, 117 S.Ct. 1382 (1997) ("The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.) In short, Plaintiffs have provided no evidence that McWilliams would have acted any differently if she was nationally accredited.

### 3. <u>Failure to Train</u>

As for Plaintiffs' <u>Monell</u> claim based on a failure to train, Defendants assert that Plaintiffs have failed to identify any specific training that was not provided that could have been expected to prevent Keohane's suicide. Defendants urge that the undisputed evidence reflects that LCP was certified by the National Commission on Correctional Health Care ("NCCHC") throughout the years preceeding and following Keohane's incarceration, thus establishing that their policies were consistent with nationally recognized correctional standards. (NCCHC Certifications for 2004-2008; Defs. Memo., p. 19.) Defendants further stress that LCP conducted in-house training and invited a noted health and suicide prevention expert to conduct annual trainings with LCP correctional and health care staff. Specifically, McWilliams had extensive training from 1999 through Keohane's incarceration in 2006, and obtained a Suicide Prevention and Intervention Instructor certification in June 2005. Defendants argue that because Plaintiffs have not suggested any additional training, they cannot show there would have been a "risk reduction." Therefore, they assert that even if there were underlying constitutional violations, Plaintiffs have provided no evidence that these violations were a result of official policy, practice or custom of failing to train personnel concerning medical needs of incarcerated persons. (Defs.' Memo., pp. 19-20.)

Plaintiffs state that LCP "had an official policy, practice or custom of failing to train prison personnel," however, we find that Plaintiffs have failed to identify any specific training that could have prevented Keohane's suicide. Indeed, Plaintiffs' own expert, Dr. Mary West, opined that, based upon a review of the training documents and attendance forms, it appeared that "the correctional officer training was not a systematic contributing factor to the Keohane suicide." (Pls.' Opp., Exh. 19, Rpt. of Dr. Mary West.)

Additionally, similar to the analysis for municipal liability based on custom or practice, a failure to train can only form the basis for liability where the plaintiff shows official knowledge of the failure. Plaintiffs have not provided any evidence that Lancaster County, Guarini or Siemasko had knowledge of the incident or any pattern of similar incidents that should have led to their recognition that the training was deficient. In <u>Simmons v. City of Philadelphia</u>, 947 F.2d 1042, 1064 (3d Cir. 1991), the plaintiff alleged that the City was deliberately indifferent in failing to train its employees about how to deal with serious medical needs of intoxicated and potentially suicidal detainees. The court found that to establish a claim of failure to train, the plaintiff must show the policymakers knew the number of suicides in City lockups and "deliberately chose not to provide officers with training in suicide prevention or acquiesced in a long standing practice or custom of providing no training in this area." <u>Id</u>. The court stressed that "a municipality's deliberately indifferent failure to train is *not* established by [] presenting evidence of the shortcomings of an individual." <u>Id</u>. at 1060 (citing <u>City of Canton</u>, 489 U.S. at 1206). Here, Plaintiffs may have provided evidence that several LCP staff did not follow the applicable procedures, but have failed to establish that the policymakers knew of or acquiesced in their behavior and made a deliberate decision not to provide further training. For all of the reasons discussed above, Plaintiffs' <u>Monell</u> claims are dismissed.

### E. Americans with Disabilities Claim

Title II of the Americans with Disabilities Act ("ADA") states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services or activities of a public entity or be subjected to discrimination by such entity." 42 U.S.C. § 12132 (2006). To sustain a claim, the plaintiff must establish that (1) he is a

qualified individual; (2) with a disability; (3) he was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability. Herman v. County of New York, 482 F.Supp.2d 554, 566 (M.D.Pa. 2007) (quoting Bowers v. Nat'l Collegiate Athletics Ass'n, 472 F.3d 524, 553 n. 32 (3d Cir. 2007)).

The Third Circuit has held that there can be no individual liability for ADA violations. Wood v. City of Lancaster, 2009 WL 80306 at *22 (E.D.Pa. Jan. 13, 2009) (citing Emerson v. Thiel College, 296 F.3d 184, 189 (3d Cir. 2002)). Therefore, the ADA claims against Vincent Guarini, Carrie McWilliams, Bonnie Bair, Troy Waltz, Robert Siemasko, Dr. Robert Doe, Edward Sutton and Brian Weaver fail as a matter of law and are dismissed.

Regarding the only remaining Defendant, Lancaster County, Defendants argue that even if they conceded that Keohane had a "disability," based on his Attention Deficit Hyperactivity Disorder ("ADHD") diagnosis, Plaintiffs have not shown that he "was excluded from participation in or denied benefits of the services, programs, or activities of a public entity or was subject to any discrimination . . . by reason of his disability." Rather, they assert that Keohane was provided with medical care for all of his medical and mental health issues and was carefully monitored in accordance with LCP policies. (Defs.' Memo., pp. 18-19.)

Plaintiffs respond that a jury could find that Keohane was "denied the benefits and services required by his serious mental health needs." Noting the breaches in LCP policy, including McWilliams' failure to obtain Dr. Doe's signature to change suicide status and her alleged lack of accreditation, Plaintiffs argue LCP's policies "are so severely lacking that they continuously fail to meet the serious mental health needs of prisoners such as decedent." (Pls.'Memo., pp. 22-23.)

However, denial of medical treatment for a disability is not encompassed by the ADA. <u>Iseley v. Beard</u>, 200 Fed. Appx. 137, 142 (3d Cir. 2006) (citing <u>Bryant v. Madigan</u>, 84 F.3d 246 (7th Cir. 1996) (finding because the ADA does not create a remedy for the denial of medical treatment, a paraplegic inmate who sued a prison after he was denied guardrails for his bed and then broke his leg when he fell from the bed, had failed to state a claim)). Consequently, Plaintiffs' ADA claim is dismissed.

### F. State Survival and Wrongful Death Claims

Plaintiffs assert state law survival and wrongful death claims against the Lancaster County Defendants. Both of these causes of action sound in tort and are governed by the Pennsylvania Political Subdivision Tort Claims Act ("The Tort Claim Act"). 42 Pa. C.S.A. § 8541, et seq. The Tort Claim Act provides defendants immunity from negligence suits, including survival and wrongful death claims, and it states that "[e]xcept as otherwise provided in this subchapter, no local agency shall be liable for any damage on account of any injury to a person or property caused by an act of the local agency or an employee thereof or any other person." 42 Pa. C.S.A. § 8541. The Act provides immunity for "[a]ny person who is acting or who has acted on behalf of a government unit, whether on a permanent or temporary basis, whether compensated or not" is an employee of that unit and covered by the Act. <u>Wood</u>, 2009 WL 80306 at *23 (citing 42 Pa. C.S.A. § 8501).

Government immunity does not apply to an employee if the employee's conduct "caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct." <u>Wood</u>, 2009 WL 80306 at *23 (citing § 8550). As Plaintiffs did not address these exceptions in their brief in opposition, it is not clear if they are arguing that any of these exceptions apply. We note that the only exception that could possibly apply is "willful misconduct."

According to the Pennsylvania Supreme Court "willful misconduct" has been defined to mean "conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied . . . . To prove willful misconduct, a plaintiff must establish that the actor desired to bring about the result that followed, or at least it was substantially certain to follow, *i.e.,* specific intent." Bright v. Westmoreland County, 443 F.3d 276, 287 (3d Cir. 2006) (citing Robbins v. Cumberland County Child and Youth Services, 802 A.2d 1239, 1252-53 (2002)). While we have found that the actions of Defendants McWilliams, Sutton, Weaver and Doe may rise to the level of reckless indifference, Plaintiffs' allegations do not establish that Defendants acted with the requisite intent to injure Keohane. These claims are, therefore, also dismissed.

### G. Punitive damages

Plaintiffs make a claim for punitive damages against all Defendants. "Both the United States Supreme Court and the Supreme Court of Pennsylvania precedents prohibit the assessment of punitive damages against public entities." Klump v. Nazareth Area Sch. Dist., 425 F.Supp.2d 622, 629 (E.D. Pa. 2006). Therefore the claim for punitive damages against Lancaster County is dismissed.

However, punitive damages in § 1983 cases are available when an individual defendant has acted with a "reckless or callous disregard of, or indifference to, the rights and safety of others." Keenan v. City of Philadelphia, 983 F.2d 459 (3d Cir. 1992). Whether conduct rises to that level is for the jury to determine. Woolfolk v. Duncan, 872 F.Supp. 1381, 1392 (E.D. Pa 1995). As noted above, we find a reasonable jury could find that the conduct of individual Defendants' McWilliams, Sutton, Weaver and Doe rose to the level of "reckless." The claim for punitive damages, therefore, survives against the remaining individual Defendants.

## IV. **CONCLUSION**

For the reasons set forth above, the "Motion for Summary Judgment of Defendants Lancaster County, Warden Vincent Guarini, Carrie McWillaims, Bonnie Bair, Troy Waltz, Robert Siemasko, Edward Sutton and Brian Weaver," is DENIED in part, and GRANTED in part and the "Motion of Robert Doe, M.D., for Summary Judgment" is DENIED.

Our Order follows.